119 So.2d 741 (1960)
CORAL GABLES FIRST NATIONAL BANK, Etc., and Pan American Bank of Miami, Etc., Appellants,
v.
CONSTRUCTORS OF FLORIDA INC., Etc., et al., Appellees.
CONSTRUCTORS OF FLORIDA INC., Etc., et al., Appellants,
v.
CORAL GABLES FIRST NATIONAL BANK, Etc., and Pan American Bank of Miami, Etc., Appellees.
AMERICAN SURETY COMPANY of New York, Etc., Appellant,
v.
CORAL GABLES FIRST NATIONAL BANK, Etc., and Pan American Bank of Miami, Etc., Appellees.
CITY OF WEST PALM BEACH, Florida, Etc., Appellant,
v.
CORAL GABLES FIRST NATIONAL BANK, Etc., and Pan American Bank of Miami, Etc., Appellees.
Nos. 58-526, 58-542  58-544.
District Court of Appeal of Florida. Third District.
March 22, 1960.
Rehearing Denied May 4, 1960.
*742 Ward & Ward and Salley & Roman, Miami, for Coral Gables First Nat. Bank and Pan American Bank of Miami.
Fuller Warren, Miami, for Constructors of Florida, Richard R. Reynolds, Jim M. Lancaster, Jr., and Earl L. Goodwin.
John H. Gunn and Thomas A. Horkan, Jr., Miami, for John Nicholas.
Egbert Beall, West Palm Beach, for City of West Palm Beach.
Blackwell, Walker & Gray, Miami, for American Surety Co. of New York.
Tom Maxey, Coral Gables, in pro. per.
HORTON, Chief Judge.
In the main appeal, (No. 58-526) the appellants Coral Gables First National Bank and Pan American Bank of Miami, hereinafter referred to as Banks, seek review of a partial final decree, as amended, which adjudicated that a certain loan transaction between appellants and appellee Constructors of Florida, hereinafter referred to as Constructors, was usurious. American Surety Company of New York, hereinafter referred to as Surety, the City of West Palm Beach, hereinafter referred to as City, and Richard R. Reynolds, J.M. Lancaster, Jr., and Earl L. Goodwin, the individual officers of Constructors, hereinafter referred to as Individuals, have filed joinders in the main appeal, and, in addition, the following separate appeals have been filed seeking review of this same decree:
In appeal No. 58-542, appellants Constructors and Individuals contend that the chancellor erred in failing to award them damages in the form of losses sustained as a result of the Banks' action in effecting a loan with a usurious rate of interest and breach of a loan contract.
In appeal No. 58-543, appellant Surety contends that the chancellor erred in failing to award to Surety damages in the form of losses sustained as a result of the *743 Banks' intentional fraudulent and tortious acts; in not awarding to Surety punitive damages; and in not granting to Surety additional attorneys' fees.
In appeal No. 58-544, appellant City contends that the chancellor erred in failing to award to City damages in the form of losses resulting from the tortious interference by Banks in the contract between City and Constructors.
These appeals were consolidated by order of this court and will be treated together in this opinion.
The Banks instituted suit to foreclose three chattel mortgages dated July 24 and July 25, 1956, and March 20, 1957, upon which there was due the sums of $13,888.95, $92,690.85 and $151,802.46, respectively, and to impose liability for any deficiency upon appellees Surety and City.
All defendants served with process filed answers denying liability. Appellees Constructors and Individuals counterclaimed, alleging that the note and mortgage dated March 20, 1957, was a renewal of an earlier note and mortgage dated November 14, 1956, in the sum of $442,400 given by Constructors to the appellant Banks and that said loan was usurious. In essence, the counterclaim alleged that the Banks, by withholding a portion of the proceeds of said loan, and charging and receiving interest in excess of that allowed by law, and by the breach of its loan agreement, directly caused the financial collapse of the appellee Constructors; that such actions by appellants caused Constructors to decline a bona fide offer to purchase 40% of its authorized capital stock for $400,000. Damages totalling more than six million dollars were claimed by Constructors and its officers.
The appellee Surety counterclaimed against appellants, adopting the position as to the usurious nature of the loan alleged by the appellee Constructors and further claimed damages against the Banks because of alleged false information furnished Surety by the Banks as to the financial condition of Constructors which resulted in the Surety's writing additional bonds for Constructors and deterred Surety from taking over certain contracts of Constructors, all of which allegedly resulted in losses to Surety of more than a million dollars. Surety further cross-claimed against appellee Constructors for sums in excess of one million dollars, and attorneys' fees, allegedly due upon some 63 promissory notes secured by chattel mortgages.
The appellee City counterclaimed, adopting the factual allegations of the answers and counterclaims of the other appellees, and, in addition, contended that the tortious interference of the Banks in contractual relationships between Constructors and the City resulted in the City's being required to take over contracts held by Constructors with City and thereby the City sustained a loss in excess of $200,000.
There were other pleadings by parties to this action, but they do not appear relevant to the issues on these appeals and therefore are not being delineated.
The charge of usury in this case evolved out of a transaction which originally took place on November 14, 1956, when Constructors executed and delivered to the Coral Gables First National Bank a chattel mortgage securing a promissory note in the sum of $442,400. This note was payable in 23 monthly installments of $3,000 each and a 24th installment of $373,400, all with interest of 5% per annum. The note also bore interest from maturity at 8%. The security for this loan was a chattel mortgage on all of the equipment of Constructors, together with an assignment of payments due Constructors under two sewer contracts, Numbers 7 and 9, with City. At the time of the execution of the $442,400 note and mortgage, Constructors was indebted to the National bank on two prior loans executed in July, 1956, in the original sums of $22,222.32 and $148,305.26, respectively, both loans secured by chattel *744 mortgages on equipment of Constructors, all of which was subsequently repledged as security for the $442,400 loan of November 14, 1956. There was also outstanding an interim loan of $60,000 due by Constructors to the National bank.
From the proceeds of the $442,400 loan of November 14, 1956, the following disbursements appear to have been made:
1) $60,000 to the Coral Gables First National Bank in repayment of the interim loan by Constructors of Florida.
2) $44,854.44 to the Coral Gables First National Bank as a commitment fee.
3) $44,240 as advanced interest for two years.
4) $90,743.18 was deposited with the Coral Gables First National Bank in Collateral Account No. 1, held jointly in the names of Constructors of Florida and the Coral Gables First National Bank, withdrawals from which required the signature of an officer of the Bank and the signature of an officer of Constructors of Florida.
5) $202,562.38 to the account of Constructors of Florida.
The commitment fee (item No. 2 above  $44,854.44) was subsequently transferred by the National bank into Collateral Account No. 1, making that account total $135,597.62. The funds from Collateral Account No. 1 were disbursed at intervals to the account of Constructors over a period of time from November 23, 1956, through January 7, 1957, when the entire account was exhausted.
The National bank established a second account known as Collateral Account No. 2, in which it deposited the proceeds of payments received by it from City under the assignment of payments given by Constructors to the bank to secure the payment of the November 14, 1956, loan. The following amounts were received by the bank from City and deposited in Collateral Account No. 2:

 November 29, 1956  $36,488.11
 December 24, 1956  42,750.32
 January 24, 1957  53,247.39
 February 26, 1957  24,168.04
 March 1, 1957  37,502.25

making a total of $194,156.11. It was from Collateral Account No. 2 that the National bank, from time to time, deducted the monthly payments of $3,000 plus 5% interest due under the terms of the note of November 14, 1956. These deductions were as follows:

 Date Principal Interest
 December 17, 1956 $ 3,000.00 $1,843.35
 January 14, 1957 3,000.00 1,893.13
 February 14, 1957 3,000.00 1,878.96
 March 7, 1957 179,540.67
 ___________ __________
 Totals $188,540.67 $5,615.44

In the early part of March, 1957, Constructors, being in straitened financial circumstances, requested the National bank to release approximately $50,000 from Collateral Account No. 2 to the general account of Constructors. The request for the release of these funds was made by letter from Constructors to the National bank and accompanied by a statement which purported to justify the requested funds. After some negotiation with an officer of Constructors, the bank agreed that $50,000 would be advanced to the general account of Constructors out of Collateral Account No. 2, and in accord with that agreement, an officer of Constructors left with an officer of the National bank a signed, undated blank check. Instead of making the transfer of the $50,000, as Constructors alleged it was agreed, the check was filled in by some officer or employee of the National bank for the sum of $179,540.67 (which was the total amount remaining in Collateral Account No. 2), countersigned by an officer of the bank, and applied against the balance due on the $442,400 note. It is contended that this application by the National bank was made without the knowledge or consent of Constructors.
*745 After the National bank had applied the $179.540.67 as aforesaid, a meeting was had among all of the parties which resulted in the execution of a new note, termed a renewal note, dated March 20, 1957, for the sum of $218,275.27, bearing interest at the rate of 15% per annum. At the same time, a usury release was executed by Constructors in favor of the National bank. There was also executed at this time a loan repayment agreement in which it was stipulated that from payments received on sewer contracts Numbers 7 and 9 with the City, the National bank would apply 65% against the indebtedness due the bank by Constructors, and 35% would be deposited into a controlled account to be used by Constructors. The March 20, 1957, note for $218,275.27 was, at the time of the institution of this suit, reduced by payments to $151,802.46.
Coral Gables First National Bank, as indicated by its name, is a national banking institution chartered under the laws of the United States, and is not permitted to lend amounts in excess of 10% of its capital and surplus. In this instance, its limit was $200,000.00. The Pan American Bank of Miami, being a state chartered institution, had no such limitation. It appears, therefore, that when the loan of November 14, 1956, was made, or shortly thereafter, the appellant Pan American was a participant in this loan to the extent of approximately $243,320. The chancellor made a finding regarding the entire participation between the two appellant Banks in the decree from which appeal is taken.[1]
The chancellor found, among other things, that the interest charged and reserved by the Banks on account of the November 14, 1956, loan exceeded 25% per annum; that appellant Banks were joint adventurers and agent and principal each for the other, and imposed penalties against the National bank under the terms of the Federal Banking Code (12 U.S.C.A. § 86) and the State bank under the terms of § 687.07, Fla. Stat., F.S.A. The penalties imposed by the chancellor are summarized as follows:

(a) Liability of Coral Gables First National Bank
 (1) Double the interest collected to March 20,
 1957 $ 99,710.88
 (2) Double the interest collected subsequent
 to March 20, 1957 10,740.70
 ___________
 $110,451.58
 Less amount credited to principal on
 renegotiation 35,584.06
 ___________
 Total $ 74,867.52
(b) Liability of Pan American Bank of Miami
 (1) Principal & interest paid to March 20, 1957 $194,156.11
 (2) Principal paid subsequent to March 20, 1957 66,472.81
 (3) Interest paid subsequent to March 20, 1957 5,370.35
 ___________
 Total $265,999.27
(c) Liability of Both Plaintiff Banks
 For cancellation of principal and interest
 remaining due $172,585.29

*746 The chancellor further found that the notes of July 24, 1956, and July 25, 1956, secured by chattel equipment mortgages, were not in default and could be paid in accordance with their respective terms with principal payments held in abeyance from the time of the alleged default to the time of the entry of a complete final decree in this cause; that the liens of City and Surety against the chattels and equipment of Constructors were superior to any claim of the Banks in this proceeding.
The chancellor found that the evidence was not sufficient to prove by a preponderance that Banks were solely responsible or liable for (1) damages suffered by Constructors resulting from the collapse of its business and forfeiture of its contracts; (2) damages suffered by Individuals resulting from the loss of value of the stock of Constructors, loss of profit, or liability of personal guarantees other than those given to Banks; (3) damages suffered by City in connection with the completion of sewer contracts Numbers 7 and 9; and (4) damages suffered by Surety on account of various bonds written or continued for Constructors and Island Construction Company.
The chancellor found that the evidence did show that (1) City did not agree in any way to guarantee any part of the loan made by Banks to Constructors and there was no basis for equitable subrogation in favor of Banks and against City; (2) City is protected in the amounts expended to complete sewer contracts Numbers 7 and 9 by bonds written by Surety; (3) Surety did not agree in any way to guarantee any part of the loans made by Banks to Constructors and there was no basis for any equitable subrogation in favor of Banks and against Surety; (4) Constructors was indebted to Surety in the amount of $1,367,379.19 on account of the various bonds written and continued for Constructors or guaranteed by Constructors; and (5) Constructors should recover against Banks for payment to Surety reasonable attorneys' fees in the amounts of $45,000 and $27,347.50 as part of the consequential damages resulting from the Banks' usurious charges and the improper manner in which the loan accounts were handled by them.
The Banks main contention is that the transaction was not usurious. They urge that the loan was not usurious at its inception and assuming, but not admitting, that it might have been, that the same was eliminated by a new contract purging the old contract of the vice of usury and making the new a valid and enforceable obligation. These arguments are without substance, particularly when viewed in the light of the evidence adduced before the chancellor. The chancellor's findings of fact and conclusions as to the usurious character of this transaction are amply supported by the record. To demonstrate that there was usury from its inception would unduly extend an already lengthy opinion. Suffice it to say that where a borrower receives a net of approximately $263,000 from a $442,400 loan, it requires little mathematical calculation to discern that something is amiss.
The Banks' secondary argument that a new contract was entered into that purged the old of its usurious odor is not borne out by the record, including their own pleadings. The Banks, in their complaint seeking foreclosure of the mortgage in question, affirmatively alleged that "on March 20, 1957, there was due and unpaid on said note of $442,400 (plaintiff's Exhibit 3) the principal sum of $218,275.27 as evidenced by a renewal contract note of that date in the sum of $218,275.27. * * * Plaintiffs would show unto the Court that said renewal note of $218,275.27 was simply a renewal and extension of the note of November 14, 1956 in the sum of $442,400 * * *." [Emphasis supplied.] The general rule followed in this state is that the usurious character of a contract must be determined as of the date of its inception, and if usurious at that time, no subsequent transactions will purge it. When such contracts are renewed by a new or substituted *747 contract, usury follows and becomes a part of the latter contract, making it vulnerable to the defense of usury in like manner as the original contract. This is not true, however, when the old contract is abandoned and a new one is entered into free from the vice of the old. See Shorr v. Skafte, Fla. 1956, 90 So.2d 604, and Wenck v. Insurance Agents Finance Corp., Fla.App. 1958, 99 So.2d 883.
Banks further urge that the chancellor was in error in imposing upon the National bank penalties in excess of that permitted by § 86, Title 12 U.S.C.A., and in imposing upon the State bank affirmative penalties in excess of $265,000, when the State bank held only a 5% participation in the renewal note of March 20, 1957; also that a portion of the $265,000 penalty, representing principal paid on the March 20, 1957, note, was wrongfully assessed against the State bank when the evidence shows that such payment was made to the National bank.
Sections 85 and 86, Title 12 U.S.C.A., in substance provide that a National bank may take, receive, reserve and charge interest at the rate allowed by the laws of the state where the bank is located and when a greater is knowingly charged, the entire interest provided for by the note, etc., shall be forfeited. Where the interest has been paid, the person so paying it may recover back twice the amount paid. No other penalties are provided and the Federal courts, as well as a majority of the State courts, have held that no other penalties except those provided in the Act can be invoked against a National bank. See Farmers' and Mechanics' National Bank v. Dearing, 1875, 91 U.S. 29, 23 L.Ed. 196 and subsequent cases collected at 12 U.S.C.A. p. 343.
The Banks argue that some of the penalties assessed against the National bank are in excess of those permitted under the Federal Act, insisting that the only penalty that should be imposed against the National bank is double the amount of interest actually paid. This argument is premised on the fact that there may have been usury in the original loan of November 14, 1956, but in no event could such penalties be applied as against the interest collected after March 20, 1957, the date of the renegotiation of the original loan. Concluding as we have that the original loan was usurious, we reject this contention of the Banks as being without merit.
Another question raised collateral to the Banks' argument that penalties were unlawfully and illegally assessed against the National bank, is that portion of the decree which voided the right of both Banks to collect the balance of $151,802.46, plus interest, the sum allegedly remaining due and unpaid on the renegotiated loan of March 20, 1957. This latter contention of the Banks is bottomed upon the factual premise that the State bank had a participation of only 10% in the renegotiated loan, with the balance of the loan allegedly represented by the funds of the National bank. This contention has partial merit, that is to say, that the Federal Act applicable to National banks as well as the decisions construing the same have almost unanimously concluded that only those penalties provided by the Federal Act could be invoked against a National bank. However, the record in this case discloses, and the chancellor found, that the loan was usurious in its inception, i.e., November 14, 1956. We have concurred in this conclusion; consequently, it is necessary to analyze the status of the participation of the respective banks at the time that the loan was found to be usurious. On November 14, 1956, or shortly thereafter, the National bank participated to the State bank $243,320 of the original loan. However, since the record clearly demonstrates, and the chancellor found, that the borrower received at most approximately $263,000 from the loan of $442,400, it would follow that the State bank's participation in the funds actually made available to the borrower was in excess of 92% of the amounts loaned. Likewise, it follows that *748 the National bank would have furnished slightly in excess of 7% of the original monies loaned. A careful scrutiny of the proceedings that took place at the time of and subsequent to the making of the original loan indicates that by the device of participation, the State bank attempted to lend its funds through a chartered National bank without subjecting itself to the loss of its principal in the event that the loan was found to be usurious under § 687.07, Fla. Stat., F.S.A. The most that the State bank could lose if this device was unsuccessful, using the National bank as its conduit, would be double the interest actually received by the National bank or a forfeiture of interest that was to accrue. In the final analysis, we conclude that the chancellor was correct in forfeiting interest due and unpaid as it applied to both the State and National banks, but that he was in error when he decreed a forfeiture of the entire amount of principal. Such portion of the remaining unpaid principal on the original loan, hereinabove noted to be approximately 7%, as had not been participated by the National bank to the State bank should have been reserved by the chancellor's decree to the National bank rather than forfeited. In forfeiting that portion of the unpaid balance of the principal belonging to the National bank, the chancellor's decree conflicts with the decisions of the Federal courts as well as those of many state courts of last resort, which hold that only the penalties prescribed by the Federal Act can be invoked against a national bank, namely an affirmative forfeiture of double the amount of interest actually paid or a cancellation or forfeiture of interest that is to accrue and is unpaid.
Another question raised by the Banks was the propriety or correctness of that portion of the decree awarding against Banks, as consequential damages, attorneys' fees contracted to be paid by Constructors to Surety under the terms of a general indemnity agreement between said parties. This arose out of the chancellor's award to Surety of sums due it under the general indemnity agreement as claimed in Surety's counterclaim against Constructors. We think the award of attorneys' fees against the Banks was erroneous, first because attorneys' fees as such cannot be awarded in the absence of statute or contract. See Hoffman v. Barlly, Fla.App. 1957, 97 So.2d 355, and cases cited therein. Secondly, the award would appear to be inconsistent with the chancellor's finding that the evidence was insufficient to establish that the Banks were solely responsible for all damage suffered by Constructors resulting from the collapse of its business. In either event, we see no basis for the award of attorneys' fees here against the Banks.
The Banks have urged other points for reversal and they have been duly considered, but found to be without merit.
Upon the appeal of Constructors and Individuals (No. 58-542) they claim error in the failure of the chancellor to award them damages in the form of losses suffered by each as a consequence of the Banks' tortious breach of contract including the act of charging a usurious rate of interest. This may be the rule as applied to torts generally, but these appellants have not cited any authority, and our research has failed to uncover any, that permits an award of consequential damages resulting from a violation of the usury statute in addition to the penalties prescribed by that statute. The Supreme Court of Florida long ago in Matlack Properties v. Citizens' & Southern Nat. Bank, 120 Fla. 77, 162 So. 148, held that but for the statute usury was not forbidden, indicating that the subject of usury was one entirely of statutory regulations and prohibition. See Yaffee v. International Co., Fla. 1955, 80 So.2d 910. See also Sodi, Inc. v. Salitan, Fla. 1953, 68 So.2d 882. Further, the Supreme Court of Florida, in Rosenblum v. Hart, Fla. 1957, 95 So.2d 18, held that the penalties provided for under §§ 687.04 and 687.07, Fla. Stat., F.S.A., are not cumulative but must be applied *749 separately to the degrees of usury defined by the statutes. Nevertheless, from our review of the record, we conclude, as did the able chancellor, that appellants failed to prove, by a preponderance of the evidence, that Banks were solely responsible or liable for all damages suffered by appellants.
The contentions of Surety and City, as evidenced by their appeals, (No. 58-543 and No. 58-544, respectively) and assignments of error therein, simply take issue with the chancellor's conclusions based upon the evidence. We have carefully considered the points raised by each appellant but are constrained to conclude that there was competent substantial evidence in the record to support the findings and conclusions of the chancellor.
The record in this case included approximately 2,000 pages of testimony and more than 100 exhibits. Able counsel for the parties on both sides are to be commended for clarity as well as brevity in the presentation of a complicated and voluminous factual case.
In the light of the views expressed, we conclude that the chancellor, in imposing against the National bank as a penalty, the forfeiture of a portion of the unpaid principal of $151,802.46 not participated to the State bank, committed error; that upon a remand of this cause, he should ascertain and determine this amount, and enter an appropriate decree reserving the same to the National bank. We further conclude that the decree, insofar as it awards against Banks attorneys' fees to Constructors, is in error and the same is hereby reversed. In all other respects, the decree appealed is affirmed.
Affirmed in part, reversed in part and remanded with directions.
PEARSON and CARROLL, CHAS., JJ., concur.
NOTES
[1] "However, Pan American Bank of Miami, as participant in each of these three (3) loans, was debited by Coral Gables First National Bank with the sums of $19,444.53, $129,767.19, and $243,320.00, or a total of $392,531.72. Actually, therefore, Coral Gables First National Bank was merely a conduit, and agent; the new loan of $442,400.00 did not, according to the books and records of Coral Gables First National Bank, increase the net amount of the indebtedness of Constructors of Florida, Inc.; rather the net amount of indebtedness to Coral Gables First National Bank, after the new loan of $442,400.00, actually decreased from $209,211.62 to $19,242.38, a net decrease of $188,969.24. In other words, immediately prior to the consummation of the alleged $442,400.00 loan on November 14, 1956, Constructors of Florida, Inc. was indebted to Coral Gables First National Bank in the amount of $209,211.62; immediately after the consummation of the allged [sic] $442,400.00 loan, Constructors of Florida, Inc. was indebted to Coral Gables First National Bank only in the small amount of $19,242.38. By loaning $393,531.72 of the money of Pan American Bank of Miami, Coral Gables First National Bank decreased its outstanding loans by $188,969.24."